319 P.3d 1017

**Caren DIAMOND and Beau Blair, Petitioners/Plaintiffs–Appellants/Appellees–Cross–Appellees,**

v.

**Craig DOBBIN and Wagner Engineering Services, Inc., Respondents/Defendants–Appellees/Appellants–Cross–Appellees,**

**and**

**STATE of Hawai'i, Board of Land and Natural Resources, Respondent/Defendant–Appellee/Appellee–Cross–Appellant.**

**No. SCWC–30573.**

Supreme Court of Hawai'i.

Jan. 27, 2014.

Harold Bronstein, Lihue, for petitioners.

Walton D.Y. Hong, Lihue, for respondents Craig Dobbin and Wagner Engineering.

Donna H. Kalama, Honolulu, Linda L.W. Chow, and Julie H. China, for respondent

State of Hawai'i, Board of Land and Natural Resources.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by ACOBA, J.

We hold that in making a shoreline determination pursuant to Hawai'i Revised Statutes (HRS) § 205A–42 (1993)[1], Respondent/Defendant–Appellee/Appellee–Cross–Appellant State of Hawai'i, Board of Land and Natural Resources (the BLNR), must consider the historical evidence of the upper reaches of the wash of the waves. The BLNR's May 21, 2010 "Amended Findings of Fact, Conclusions of Law, and Decision and Order" (Amended Decision), establishing a certified shoreline for the property owned by Respondent/Defendant–Appellees/Appellants–Cross–Appellee Craig Dobbin (Dobbin) and surveyed by Respondent/Defendant–Appellees/Appellants–Cross–Appellee Wagner Engineering Services, Inc. (Wagner) located in Wainiha, Kauai (the property), effectively failed to do so and contained errors of law and clearly erroneous findings of fact. Accordingly, the BLNR's Amended Decision is vacated. Correspondingly, the October 3, 2012 Judgment of the Intermediate Court of Appeals (ICA)[2], upholding the Amended Decision and vacating the March 31, 2011 Judgment of the Circuit Court of the Fifth Circuit (the court)[3] that had sustained the appeal of Petitioners/Plaintiffs–Appellants/Appellees–Cross–Appellees Caren Diamond and Beau Blair (Petitioners) as against the said BLNR Amended Decision, is also vacated. For the reasons stated herein we vacate the court's March 31, 2011 Judgment in part. We remand to the court, with instructions to remand the case to the BLNR for proceedings consistent with this opinion.

---

1. HRS § 205A–42 states in its entirety:

   **§ 205A–42 Determination of the shoreline.** The board of land and natural resources shall adopt rules pursuant to chapter 91 prescribing procedures for determining a shoreline and appeals of a shoreline determinations; provided that no determination of a shoreline shall be valid for a period longer than twelve months, except where the shoreline is fixed by manmade structures which have been approved by appropriate government agencies and for

   which engineering drawings exist to locate the interface between the shoreline and the structure.

2. The Honorable Daniel R. Foley, Alexa D.M. Fujise, and Katherine G. Leonard presided.

3. "The court" refers to the Circuit Court of the Fifth Circuit presided over by the Honorable Kathleen N.A. Watanabe.

## I.

## A.

## The Shoreline Certification Process

In 1986, the legislature enacted Act 258, which amended HRS chapter 205A, governing coastal zones. 1986 Haw. Sess. Laws Act 258, § 1 at 466–68. As part of Act 258, the legislature amended the definition of "shoreline" found in HRS § 205A–1 (Supp.2005) to read as follows: " 'Shoreline' means the upper reaches of the wash of the waves, other than storm or tidal waves, <u>at high tide during the season of the year in which the highest wash of the waves occurs,</u> usually evidenced by the edge of the vegetation growth, or the upper limit of debris left by the wash of the waves." [4] 1986 Haw. Sess. Laws Act 258, § 2 at 469 (emphasis in original). That section also defines "shoreline area" as "all of the land area between the shoreline and the shoreline setback line...." HRS § 205A–41 (2001 Repl.). The "shoreline setback line" is "that line established in [HRS Chapter 250, Part III] or by the county running inland from the shoreline at a horizontal plane." *Id.*

HRS § 205A–42 authorizes the BLNR to "adopt rules pursuant to chapter 91 prescribing procedures for determining a shoreline and appeals of shoreline determinations[.]" Pursuant to this statutory mandate, the BLNR adopted, *inter alia,* Hawai'i Administrative Rules (HAR) § 13–222–10 (2003) [5], setting forth the procedure for shoreline certification, and HAR § 13–222–26 (2003) [6], describing the process for appealing a shoreline certification.

## B.

## 2005 Shoreline Certification Application

On June 27, 2005, Esaki Surveying and Mapping, Inc. filed an application for Shoreline Certification with the DLNR on behalf of Jeffrey Galloway (Galloway), the owner of the property. The purpose of the Shoreline Certification was to obtain a Building Per-

---

**4.** This amendment is consistent with this court's decision in *County of Hawai'i v. Sotomura,* 55 Haw. 176, 182, 517 P.2d 57, 62 (1973), discussed *infra.* *Sotomura* clarified the definition of "shoreline" in HRS § 205A–1 for purposes of a shoreline certification, holding that, "as a matter of law ... <u>where the wash of the waves is marked by both a debris line and a vegetation line lying further mauka[ ],</u> the presumption is that the upper reaches of the wash of the waves over the course of a year <u>lies along the line marking the edge of the vegetation growth."</u> 55 Haw. at 182, 517 P.2d at 62 (emphases added).

**5.** HAR § 13–222–10 provides, in relevant part:
§ 13–222–10 <u>Review, revision and certification.</u>
(a) The state land surveyor shall review the map, using the photographs, other documents and information provided by the applicant, and the state land surveyor's knowledge of the affected area to determine the shoreline.
....
(d) When satisfied with the location of the shoreline, the state land surveyor shall transmit the shoreline maps to the chairperson [of the BLNR] for his approval and signature.
(e) This map shall be the proposed shoreline certification. The public notice of this proposed shoreline certification shall be made in accordance with section 13–222–12.
....
(g) If an appeal is filed under section 13–222–26, the certification process shall be stayed until the administrative appeal is resolved by the [BLNR] or chairperson [of the BLNR].

**6.** HAR § 13–222–26 provides, in relevant part:
§ 13–222–26 <u>Appeal of shoreline certification.</u>
(a) Upon timely application, the following persons or agencies may have standing to appeal:
....
(4) Other persons or agencies who can show a substantial interest in the matter; provided that the [BLNR] or chairperson [of the BLNR] may grant standing only if the person's or agency's participation will substantially assist the board or chairperson in its decision making.
....
(c) Any person or agency wishing to appeal shall file a notice of appeal in writing with the department no later than 20 calendar days from the date of the public notice of the proposed shoreline certification or rejection.
(d) The notice of appeal shall state the legal and factual basis for the appeal.
(e) Upon determination that a person or agency has standing to appeal, the chairperson [of the BLNR] by written order shall set forth the schedule for the briefs and requirements for the briefs.
(f) The sole issue on appeal shall be whether the proposed shoreline certification or rejection was proper.
....

mit.[7] Galloway's application was transmitted to State of Hawai'i Department of Accounting and General Services (DAGS) Surveyor Reid Siarot (Siarot). *See* HAR § 13–222–10(a) (2003) ("The state land surveyor shall review the . . . information provided by the applicant[.]").

Petitioners and Barbara Robeson sent a letter to Siarot requesting that a site visit be conducted during the winter months to determine the appropriate shoreline. On April 12, 2006, Siarot sent a letter to the DLNR stating that he had inspected the shoreline at the site, and that Dennis Esaki (Galloway's surveyor), Petitioners, and others "participated in the site inspection." Siarot stated that, "[a]s a result of the inspection, the shoreline was determined to be at the debris line near the mauka[8] edge of the naupaka[9] hedge, further mauka than deliniated on the map. Mr. Esaki was advised to revise his maps and photographs." (Emphasis added.) Because Dennis Eskai had failed to return his calls or provide the requested information during a period of six months, Siarot recommended that, in accordance with HAR § 13–222–7(b)(15) and (I) (2003) [10], Galloway's application be rejected. Galloway subsequently sold the property.

7. The purpose of the shoreline certification process is "to standardize the application procedure for shoreline certifications for purposes of implementing the shoreline setback law and other related laws." HAR § 13–222–1 (2003). HRS § 205A–43(a) (2001 Repl.) provides that "[s]etbacks along shorelines are established of not less than twenty feet and not more than forty feet inland from the shoreline." The "shoreline setback lines," along with the certified shoreline, dictate the location of the "shoreline area", an area where there are limitations on the structures that may be built. *See* HRS § 205A–44 (2001 Repl.) ("[e]xcept as provided in this section, structures are prohibited in the shoreline area without a variance pursuant to this part.").

8. "Mauka" means "inland". *See* Mary Kawena Pukui & Sameul H. Elbert, *Hawaiian Dictionary* 242, 365 (2d ed. 1986) [hereinafter Pukui & Elbert, *Hawaiian Dictionary*].

9. "Naupaka" is "a spreading, succulent shrub found on coasts of tropical Asia and some islands in the Pacific." Pukui & Elbert, *Hawaiian Dictionary,* at 263.

10. HAR § 13–222–7 provides, in pertinent part:
§ 13–222–7 Application.

## 2008 Shoreline Certification Application

On January 11, 2008, Dobbin and Wagner filed a Shoreline Certification application with the DLNR for the same property. The purpose of the certification was to obtain a building permit for Dobbin, the new owner of the property. The DLNR accepted the application and transmitted it to Siarot. The application was also submitted for publication in the Office of Environmental Quality Control (OEQC) Environmental Notice, to allow for public comment.

As with the 2005 shoreline certification, Petitioners sent a letter to Siarot requesting a site visit inspection and suggested that Siarot review his previous photographs and file for the property because of "[n]aupaka enroachment issues, planted beach heliotropes[11], [and a] shoreline too seaward . . ." On April 18, 2008, a site visit was conducted. A report of the site visit (report) indicates that the survey personnel were Siarot, Ian Hirokawa (Hirokawa), and Chris Conger, who were accompanied by Petitioners and Ron Wagner. The report differed from the shoreline location recommended by Siarot in 2005, that "was considerably mauka" of the ocean:

(a) Application for shoreline certification shall be in writing, addressed and mailed to the [BLNR].
(b) The application shall contain the following:
. . . .
  6. Maps of the shoreline to be certified, in accordance with Section 9.
. . . .
  15. Any other information requested by the [DLNR] or the state land surveyor as reasonably necessary to evaluate the application.
. . . .
(I) If, upon review of an application, the [DLNR] or the state land surveyor finds: (1) noncompliance with any rule under this chapter, (2) irregularity in surveying methods utilized, or (3) the application or any information submitted by the applicant to be in error or a misrepresentation of the facts, then the application shall be denied and returned to the applicant, the 90–day time period shall cease, and the applicant shall be required to resubmit a new application.
(Emphases added.)

11. "Heliotrope" is defined as "any of a genus of herbs or shrubs of the borage family." *Merriam Webster's Collegiate Dictionary* 539 (10th ed. 1993).

**Shoreline:** .... The profile started to mauka with a graded area in the lawn; then moved makai[12] to the berm of graded sand; then the orange construction fence; the start of the naupaka hedge and back of the dune, St. Augustine grass and Iron Wood debris on the west side; the dune crest and contact between old accumulated Iron Wood debris and fresh Iron Wood and other debris; the makai edge of the hedge ([n]aupaka, beach heliotrope, spider lily) and debris; beach face; recent debris line (cobble and gravel); the berm crest and berm face; makai edge of sand and start of beach rock; and most makai was the beach rock ridge and swash zone.

. . . .

**Decision:** Recommended the proposed shoreline for certification. A different location, considerably farther mauka on the back of the frontal dune, was identified as the shoreline location during an October 19, 2005 site visit (KA–034–2A) by Dolan Eversole, Chris Conger, [ ] Siarot, and Morris Atta. There is no evidence that the wash of the waves has extended that far mauka in the past two winters, especially the most recent winter season.

(Emphases added.) Siarot sent a letter dated May 28, 2008 to the DLNR, Land Division Administrator, Morris M. Atta, recommending that "the State of Hawai'i should have no objections to adopting the dune crest as the shoreline as delineated on the map prepared by [Wagner]."

Notice of Appeal to the BLNR

On June 8, the proposed shoreline certification for the property was published in the OEQC bulletin, and on June 27, 2008, Petitioners filed a Shoreline Certification—Notice of Appeal, stating that "[t]he proposed shoreline certification does not properly or accurately locate the shoreline according to the upper reaches of the wash of the waves at high tide during the season of the year

when the highest wash of the waves occurs." On September 17, 2008, Hirokawa, a Project Development Specialist with the Land Division of DLNR, recommended to Laura Thielen, at that time the Chairperson of the BLNR (Chairperson Thielen), that the BLNR grant Petitioners standing to appeal the shoreline application [13] and also grant Dobbin and Wagner standing to participate in the appeal. Chairperson Thielen approved the recommendation on September 22, 2008, and issued an order notifying the parties of standing, the briefing schedule, limits on ex parte communications, and the potential for site inspections.

In their brief to the BLNR, Petitioners cited to HRS § 205A–1, which as stated, provides the statutory definition of "shoreline," and argued that "[e]ach year, depending upon the size and direction of the swells, the winter waves repeatedly wash well into and beyond the currently proposed shoreline for [the property]." With respect to their contention that Respondents Dobbin and Wagner's proposed shoreline did not represent the shoreline in accordance with the definition at HRS § 205A–1, Petitioners argued several points. First, they alleged that their evidence, in the form of photographs, was the "most credible" and that Siarot incorrectly located the shoreline "based solely in this case, upon 'on the ground evidence,' at the time of the April 18, 2008 site visit." (Emphases in original.) Second, Petitioners averred that "the State Surveyor ignore[d] his own recommendations of October 19, 2005, and further ignore[d] the importance of the historical evidence which confirms the Surveyor's previous location of the shoreline . . . ." (Emphases in original.) They stated that, "[s]imply put, the DLNR's current determination of the shoreline based upon a limited one year time frame, *i.e.* the particular year for which the certification is sought, is wrong as a matter of law."

---

**12.** "Makai" means "on the seaside, toward the sea, in the direction of the sea." Pukui & Elbert, *Hawaiian Dictionary,* at 114.

**13.** The order attached to the recommendation stated that an organization called "North Shore Ohana" with an address that was "c/o Barbara Robeson" was deemed not to have standing in

the matter due to its failure to present evidence or facts sufficient to establish a prima facie case to grant standing. Barbara Robeson was the other person, in addition to Petitioners, who had requested a site inspection for the property when Galloway's application was under consideration.

In support of these first two arguments, Petitioners contended that the exhibits they provided,[14] including photographic evidence, demonstrated the highest wash of the waves, and that the naupaka and heliotrope trees on the property were acting as a " 'barrier' which [was] prevent[ing] and[/]or hinder[ing] the observation of the true evidence of the debris line created by the upper wash of the winter waves." (Emphases in original.) They alleged that the naupaka and other salt tolerant plants evidenced in the photographs were being used to create an artificial shoreline and resulted in a vegetation line that did not represent the "highest wash of the waves."

Finally, Petitioners contended that using the "artificial shoreline," represented by the vegetation line on the property, as the certified shoreline was against public policy. They suggested that this court has held "that public policy 'favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible[,]' " (quoting *Sotomura*, 55 Haw. at 180, 517 P.2d at 61), and that their proposed shoreline, based on the 2005 State Surveyor recommendations, was in accord with this policy.

Dobbin and Wagner Brief in Support of Their Proposed Shoreline

On November 12, 2008, Dobbin and Wagner filed their answering brief with the BLNR. First, they alleged that "[a]lthough the [DLNR] has historically been lenient in permitting lay witnesses to testify as to factual underpinnings, the ultimate determination of the upper reaches of the wash of the waves at high tide in the season of the year in which the highest wash of the waves occurs is one for experts and those qualified under the law." Thus, they related, the determination of the property shoreline as made by the licensed surveyor (Wagner), and as reviewed by Siarot and DLNR personnel, should be "afforded deference" as a matter of administrative law.

Second, Dobbin and Wagner argued that Wagner's determination of the shoreline, as affirmed by the State Surveyor and DLNR personnel was "supported by substantial evidence and complie[d] with all applicable statutory and regulatory requirements." Dobbin and Wagner contended that the proposed certified shoreline satisfied the two relevant indicators in the statutory definition of "shoreline" as set forth in HRS § 205A–1— the vegetation line and the upper limit of debris. They maintained that there were mature ironwoods and naupaka established makai of the dune crest and that the debris shown in Petitioners' photos had originated from "falling branches and needles along the shoreline[,]" rather than from the wash of the waves. According to Dobbin and Wagner, any debris that was from the waves had slid down the dune and thus was "back side debris", rather than the " 'upper limit of debris left by the wash of the waves.' " (Quoting HRS § 205A–1.) (Emphasis added.)

In support of the shoreline proposed by Wagner, Dobbin and Wagner attached exhibits [15] that included (1) an affidavit of Steve Moody (Moody affidavit), the owner of the property before Galloway from 2000 to 2004,

14. Petitioners provided, as exhibits to their brief to the BLNR, (1) Wagner's proposed shoreline certification map for the property, (2) a December 26, 2007 proposed shoreline certification map for the property, (3) a number of photographs, (4) Siarot's letter dated April 12, 2006, (5) an email from DLNR employee Chris Conger dated May 30, 2008, and (6) testimony from Charles "Chipper" Wichman, Director of Limahuli Garden and Preserve, regarding naupaka plants (Wichman testimony). Petitioners also attached declarations from Beau Blair (Blair declaration), Caren Diamond (Diamond declaration), and Barbara Robeson (Robeson declaration).

15. Respondents Dobbin and Wagner attached to their brief (1) the map of the proposed shoreline prepared by Wagner, (2) their original application to the BLNR for shoreline certification, (3) a copy of the notice of proposed shoreline certification in the OEQC Environmental Notice, (4) Petitioners' Notice of Appeal, (5) a declaration of Dobbin (Dobbin declaration), (6) a declaration of Galloway (Galloway declaration), (7) the Moody affidavit, (8) the Shook affidavit, (9) a copy of the DLNR's "Report to the Twenty–Third Legislature Regular Session of 2006, Requesting a Review and Analysis of the Issues Surrounding the Shoreline Certification Process for the Purpose of Establishing Shoreline Setbacks," (DLNR Report to the Legislature) and (10) a "Problem Statement" by Chip Fletcher, Geologist at the University of Hawai'i, created as part of a 2005 Shoreline Working Group.

stating that there was no planting of vegetation along the shoreline front at any time; and (2) an affidavit of Danny Shook (Shook affidavit), who did landscaping work for Moody, stating that the irrigation and sprinklers in place "were not aimed towards nor intended to irrigate the naturally growing shoreline vegetation." Dobbin and Wagner alleged that Petitioners' photographs indicated that "none of the sprinklers were aimed toward the shoreline vegetation." With respect to Petitioners' proposed shoreline, Dobbin and Wagner contended that Petitioners' shoreline was completely arbitrary, that "[t]here is no admissible proof to support their asserted line, nor anything to tie that line to the statutory criteria," and that "the heavy natural growth of the naupaka fronting the shoreline renders it impossible to discern any line of debris at such a distance from the certified shoreline[.]"

Third, Respondents Dobbin and Wagner alleged that all of Petitioners' photographs "purporting to show a debris line from years past are irrelevant" because "[a]s a matter of law, wave events from past years do not and cannot establish the upper reach of the wash of the waves in the season of the year in which an applicant submits." (Citing *In re Application of Sanborn*, 57 Haw. 585, 588, 562 P.2d 771, 773 (1977).) Dobbin and Wagner contended that this interpretation of HRS § 205A–1 was appropriate because "[s]tatutes regulating, restraining or interfering with private property are subject to a strict construction" (citation omitted), and "where the terms of the statute are plain, unambiguous and explicit, as in this case, the appellate body is not at liberty to look beyond the statutory language for a different meaning[,]" (citations omitted).

They also alleged that this "current year" requirement is recognized in the DLNR Report to the Legislature, in which it recommended that the term " 'annual' means that the wave must have a statistical recurrence interval of at least once per year." (internal quotation marks omitted.) According to them, the requirement that an application for shoreline certification include maps " 'based on an actual field survey conducted within ninety (90) days prior to the filing … [,]' " (quoting HAR § 13–222–9(c) (2003)), indicates that the map should be based on that year's field survey alone.

Fourth, they contended that even if other years could be considered by the BLNR, the evidence from preceding years of "gravity flow down the backside of the dune [on the property] [was] insufficient" to establish the "upper reaches of the wash of the waves[,]" because a gravity flow of debris down the dune does not mark the "upper reaches." According to Respondents Dobbin and Wagner, the statute uses the phrase "upper," and that interpretation is consistent with the BLNR Report to the Legislature, which states that " 'run up' means that the water position setting the shoreline <u>must be derived exclusively by wave energy run-up, and not aided by gravity or funneling through narrow passages.</u>" [16] (Internal quotation marks omitted.) (Emphasis in original.)

Fifth, they argued that the statutory definition of a shoreline recognizes the presence of vegetation as a possible shoreline indicia, and that the BLNR should not speculate on how far debris would travel absent intervening vegetation, because that would mean that it gave the debris line preference over the vegetation line, in contravention of *Diamond v. State Board of Land & Natural Resources*, 112 Hawai'i 161, 174, 145 P.3d 704, 717 (2006) (*Diamond I*). In other words, they maintained that if debris was stopped in its movement by the vegetation, the BLNR should allow the area where it stopped to represent the shoreline, rather than prioritizing a hypothetical debris line over an actual vegetation and debris line.

### The BLNR's Denial of Petitioners' Appeal

On June 17, 2009, Hirokawa transmitted a memorandum to BLNR Chairperson Thielen, recommending that she deny Petitioners' appeal, "based upon [Petitioners'] failure to provide evidence to support the relocation of the shoreline at their proposed location."

---

**16.** Dobbin and Wagner did not explain how this proposed definition of "run up" from the BLNR Report to the Legislature should be read in conjunction with other regulations or with the statutory definition of "shoreline."

The memorandum stated that "[t]he evidence they provide is largely anecdotal, and the photographs provided, which are often undated, do show an increased growth in naupaka and various debris lines. However, a closer examination of the photographic evidence provided fails to overcome their burden of proof to justify moving the shoreline to their proposed location." Attached to the memorandum were the Findings of Fact (findings), Conclusions of Law (conclusions), and Decision and Order. Chairperson Thielen approved the memorandum on June 19, 2009.[17]

On June 19, 2009, Chairperson Thielen signed the memorandum and the "Findings of Fact, Conclusions of Law, and Decision and Order" (collectively, Decision). She certified the shoreline in accordance with Wagner's map and Hirokawa's recommendation, on June 25, 2009.

## II.

First Appeal—No. 30573

Petitioners appealed the BLNR's Decision to the court on July 20, 2009. Petitioners challenged a number of the BLNR's findings and conclusions, and argued that the Decision and Order was "arbitrary, capricious, or characterized by an abuse of discretion or clearly unwarranted exercise of discretion

and wrong as a matter of law." (Quoting HRS § 91–14(g) (1993) [18].)

On March 2, 2010, the court heard oral arguments in the case, and on April 6, 2010, the court entered its "Findings of Fact, Conclusions of Law, Decision and Order." In its conclusions, the court held, *inter alia,* that:

2. HRS § 205A–1 defines "shoreline" as "the upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves."

. . . .

8. The BLNR's characterization as either 'anecdotal evidence and/or unreliable evidence' with respect to both the detailed Declarations of [Petitioners and Robeson], and the photographs they submitted in support of their appeal is arbitrary, capricious and/or characterized by an abuse of discretion or clearly unwarranted exercise of discretion, not in accordance with HAR § 13–222–10.

9. The map of the certified shoreline published on June 8, 2008 and signed by the Chairperson on June 25, 2009 based upon the "conditions existing on December 4,

**17.** The June 19, 2009 "Findings of Fact, Conclusions of Law, and Decision and Order" began with a preface that distinguished the certified shoreline from the "shoreline property boundaries" and the "private property line." The BLNR stated,

Unlike shoreline property boundaries, certified shorelines are valid for a period of one year only (with an exception for shorelines along fixed manmade structures), and may in fact not coincide in the same location with shoreline property boundaries. Similarly, the private property line that delineates the public's right of access along shorelines typically extends further mauka than both the certified shorelines and shoreline property boundaries because unlike the latter two, it is not limited by the exclusion of the effects of hurricanes and tsunamis on coastal areas.

It appears that by using the phrase "private property line" the BLNR was referring to the boundary delininating a "beach transit corridor" pursuant to HRS § 115–5 (1993). A "beach transit corridor" designates an area where there is a public right of transit "along the shoreline below the private property lines[.]" *Id.* It is

unclear what statutory or regulatory definition the BLNR is referring to when it uses the general term "shoreline property boundaries."

**18.** HRS § 91–14(g) provides:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

2007" does not correctly reflect the "upper reaches of the wash of the waves at high tide during the season of the year in which the highest wash of the waves occurs", as provided in HRS § 205A–1.

. . . .

12. The current certified shoreline appears to incorrectly allow for the manipulation of the shoreline based upon artificially induced and enhanced vegetation, not in accordance with HRS § 205A–1.

13. The BLNR's interpretation of HRS § 205A–1, *et seq.* that only the "current" year's evidence of the upper reaches of the wash of the waves should be considered in determining the shoreline is arbitrary, capricious and/or characterized by an abuse of discretion or clearly unwarranted exercise of discretion in applying HRS § 205A–1, *et seq.*, as it conflicts with and/or contradicts the purpose and intent of HRS § 205A–1, *et seq.*

. . . .

17. The BLNR's interpretation of HRS § 205A–1 to limit its analysis of the upper reaches of the wash of the waves for only the "current" season is contrary to the intent of the statute and public policy to preserve as much shore as reasonably possible for public use.

(Emphases added.) In its Decision and Order, the court vacated the BLNR's initial Decision and remanded to the BLNR with "specific instructions to appropriately consider and give due weight to [Petitioners'] proposed evidence and to correctly apply the applicable statutes, case law and administrative rules . . . ." On May 19, 2010, the court entered its judgment in the case.

Soon thereafter, on June 17, 2010 Dobbin and Wagner appealed from the court's final judgment to the ICA (first appeal), and the BLNR filed a cross-appeal on June 21, 2012.

### III.

### The BLNR's Amended Decision

In the meantime, on May 21, 2010 in conjunction with the court's remand, the BLNR filed its Amended Decision. In addition to revising, to some extent, the findings in its first decision, the BLNR added additional findings and conclusions. Among the changes was the addition of a section in the findings titled "Prior Application for Shoreline Certification," which discussed the DLNR's actions with respect to the 2005 Galloway application. The new findings also included, *inter alia,* the following statements:

27. The DLNR and State Surveyor also incorporate in their shoreline determination, any pertinent information about the shoreline that is presented by the owner of the subject property and any other member of the public that has personal knowledge and familiarity with the shoreline conditions of the subject property during high surf conditions in the season of high surf.

. . . .

37. During the site visit the State Surveyor and DLNR staff noted that a different location, on the back of the frontal dune, was identified during a previous site visit on October 19, 2005; which was considerably further mauka than the proposed shoreline location in the Dobbin application.

38. The State Surveyor and DLNR staff also noted that there was no evidence that the wash of the waves had extended that far mauka in the past two winters, especially not during the immediately preceding winter season.

### RECOMMENDATION OF THE STATE SURVEYOR

39. On May 28, 2008, in a letter to the [DLNR], the State Surveyor stated that the State of Hawai'i had no objections to adopting the dune crest as the shoreline location, as delineated on the map prepared by [ ] Wagner.

40. This recommendation was based, at least in part, on the Galloway application, the Dobbin application, and the site inspection conducted on April 18, 2008.

41. At the time of the recommendation, the State Surveyor was aware that two years prior the recommended location of the shoreline for the [ ] [p]roperty was further mauka than the current location.

(Emphases added.)

The Amended Decision included a separate section of findings setting forth in more de-

tail the evidence presented by Petitioners, and the BLNR's evaluation of that evidence. For example, the findings stated, *inter alia,* with respect to the Blair Declaration, that:

46. [Petitioner] Blair's testimony did not refer to specific observations she made of the shoreline, either as to the location of the highest wash of the waves or any dates when these high tides occurred.

47. [Petitioner] Blair also testified regarding photographs which were attached to [Petitioners'] Opening Brief at 9–12.

48. The photographs contained in Exhibits G through N of [Petitioners'] Opening Brief are date stamped, either on the photos or in the captions, with dates falling between 2004 and 2008.

49. [Petitioner] Blair testified that the photos show "the upper reaches of the wash of the waves during the season of the year in which the highest wash of the waves occurs on the Dobbin property." [ ]

50. The photos enumerated in [Petitioner] Blair's testimony do not all contain depictions of waves.

51. It is not possible to ascertain from [Petitioner] Blair's testimony what was the object of specific photographs or what they were purported to portray.

52. [Petitioner] Blair's testimony did not contain any information as to the dates when specific photographs were taken or who took the photographs.

. . . .

56. [Petitioner] Blair's and [Petitioner] Diamond's testimony do not clearly identify what each photograph is purporting to depict.

(Emphases added.) Similarly, the Amended Decision set forth the evidence provided by Respondents Dobbin and Wagner in a section titled, "Evidence Presented by Appellees Dobbin[ ][,]" although this section did not discuss the DLNR's evaluation of that evidence. The new and revised findings on Dobbin and Wagner's evidence included, *inter alia,*

69. [Respondents] Dobbin and Wagner's Opening Brief refuted the assertions that the vegetation growing along the shoreline was planted and "induced" with the aid of irrigation. [ ]

70. [Respondents] Dobbin and Wagner, as part of their Answering Brief, presented an affidavit and a couple of declarations from people who had owned the [ ] [p]roperty during the period from 2000 to present. [ ]

71. The current and prior owners all denied ever planting anything along the makai side of the [ ] [p]roperty. [ ]

72. [Moody], the owner of the [ ] [p]roperty from 2000 to 2004, admitted to having an irrigation system [on] the property, but he testified that the system was located several feet away from the edge of the naupaka growing along the shoreline and that all of the sprinkler heads were aimed so the spray would be parallel to or away from the shoreline. [ ]

73. [Respondent] Dobbin also submitted testimony from [Shook], the contractor for [Moody], who testified that when he was hired in late 2003 there [were] already naupaka and ironwood trees, with possibly beach heliotropes and wedelia, growing closest to the shoreline. [ ]

. . . .

75. [Shook] also testified that an irrigation system was installed on the [ ] [p]roperty for the purpose of irrigating the lawn and that the sprinkler heads were aimed so that the spray pattern would be in a mauka direction or parallel to the shoreline in a deliberate attempt to avoid the irrigation of the naupaka and other vegetation growing along the shoreline. [ ]

(Emphases added.)

The BLNR's conclusions stated, *inter alia,*

5. HRS § 205A–1 and HAR § 13–222–2 defines the shoreline as:

[T]he upper wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.[19]

19. As will be discussed *infra,* this definition, apparently quoted, is not actually what is provided

. . . .

7. Shoreline certifications are expressly limited to a twelve month validity period, except in the circumstance where there is a legal artificial structure. HRS § 205A–42(a) and HAR § 13–222–11.[20]

9. The multi-variable approach used by the DLNR and State Surveyor is the most reasonable and appropriate method for determining the location of the shoreline for shoreline certification purposes pursuant to HRS § 205A–1 and HAR § 13–222–2.

. . . .

11. [Petitioners] failed to establish by a preponderance of the evidence that the proposed certified shoreline was not proper.

(Emphasis added.)

### IV.

Appeal from the BLNR's Amended Decision—CAAP–11–000345

On May 25, 2010, Petitioners filed a Notice of Appeal to the circuit court,[21] appealing the BLNR's Amended Decision (second appeal). On August 3, 2010, the circuit court granted Petitioners' July 1, 2010 Motion to Reassign Case, and reassigned the case to the court that heard the first appeal.

### A.

Petitioners filed their opening brief on September 30, 2010, alleging that the Amended Decision "clearly is not consistent with the [c]ourt's April 6, 2010 Decision and Order, and constitutes an unwarranted abuse of the Chairperson's discretion in recertifying the shoreline in the same place as previously vacated by [the] [c]ourt." (Emphases in original.) Petitioners reiterated their arguments from their previous appeal, contend-

ing that the new findings in the Amended Decision relating to the characterization of Petitioners' evidence were clearly erroneous and an abuse of discretion, and concluding that the recertification of the shoreline to the same location as previously vacated by the court was arbitrary, capricious or characterized by an abuse of discretion.

Dobbin and Wagner filed their answering brief on November 9, 2010, averring that the BLNR adhered to the court's directions in its April 6, 2010 Decision and Order, gave due weight to the evidence of Petitioners, and correctly applied the applicable law in confirming Dobbin and Wagner's proposed shoreline. The BLNR's answering brief was also filed on November 9, 2010, alleging that its determination of the shoreline location was entitled to deference, and that its interpretation HRS § 205A–42 as the location of the high tide during the season of the current year in which the highest wash of the waves occurs was not arbitrary and capricious.[22] Petitioners filed a reply brief on November 24, 2010, concluding, *inter alia,* that "[t]he BLNR's decision that [Petitioners] have not provided evidence to meet its burden of proof as to the location of the shoreline is in and of itself incredible." (Emphasis in original.)

### B.

The court heard oral arguments in the second appeal on January 5, 2011. Each of the parties was asked to submit proposed findings of fact, conclusions of law and a proposed order. On February 16, 2011, the court entered its Findings of Fact (findings), Conclusions of Law (conclusions), Decision and Order (collectively, Second Decision) in

by HRS § 205A–1 and HAR § 13–222–2. Those provisions differ from the BLNR's recitation, in that they state that " 'shoreline' means the upper reaches of the washes of the waves," rather than the BLNR's quote which states that it is "the upper wash of the waves." *See* HRS § 205A–1 and HAR § 13–222–2.

20. It is noted that there was no COL No. 8 in the BLNR's Amended Decision. The COLs went directly from No. 7 to No. 9.

21. "Circuit court" refers to the Circuit Court of the Fifth Circuit presided over by the Honorable Randal G.B. Valenciano.

22. Despite arguing in favor of a "current year" interpretation of HRS § 205A–42, the BLNR had indicated that it took Petitioners' historical evidence, which included the past years' wash of the waves, into account in making its determination. The BLNR argued that less weight should be given to historical evidence.

this second appeal. The court's findings included, *inter alia*,

33. The vegetation planted on Lot 12 during December, 2003, and January and February, 2004 has been artificially induced by human intervention and does not represent evidence of the shoreline.

. . . .

40. The evidence submitted by [Petitioners], including the photographs, clearly shows that the "upper reaches of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs" reaches further mauka onto [the property] than the BLNR's "current" location of the shoreline at the "dune crest."

(Emphases added.) The court included the following conclusions,

8. The BLNR's characterization as unreliable the evidence with respect to both [Petitioners' declarations], and the photographs submitted in support of the appeal is arbitrary, capricious, and constitutes an abuse of discretion or unwarranted exercise of discretion.

. . . .

10. The vegetation planted on lot 12 in 2003 and 2004 was planted seaward of the shoreline as located by [ ] Siarot, State Surveyor at the October 19, 2005 site visit to the subject property. This artificially induced and enhanced vegetation is incorrectly being used to currently locate the shoreline and/or hinder the true evidence of the location of the shoreline in accordance with HRS § 205A–1.

. . . .

12. The May 21, 2010 recertified shoreline incorrectly allows for the manipulation of the shoreline based on artificially induced and enhanced vegetation.

. . . .

23. The BLNR's interpretation of HRS § 205A–1 and HRS § 205A–42 which is based upon the limited duration of a shoreline certification in conjunction with the definition of shoreline, and which requires that the BLNR's certified shoreline determination reflect the "current" location of

the shoreline is arbitrary, capricious and constitutes an abuse of discretion or unwarranted exercise of discretion.

(Emphases added.) Finally, it set forth its Decision and Order, as provided below.

1. The BLNR's [Amended Decision] is hereby reversed and vacated.

2. The certified shoreline as delineated on the shoreline survey map for the subject property that was published for final certification in the OEQC Bulletin on June 8, 2008 and reapproved and reaffirmed by the BLNR's Chairperson, [ ] Thielen on May 21, 2010 is hereby reversed and vacated.

3. The shoreline for [the property] should be located approximately 20 feet mauka of the shoreline as shown on the shoreline certification map published for final certification on June 8, 2008 and resigned by the Chairperson on May 21, 2010.

4. Any further certified shoreline proceedings before the BLNR for [the property] shall be consistent with this [c]ourt's Findings of Fact; Conclusions of Law; Decision and Order.

(Emphases added.) The court entered its judgment on March 31, 2011.

In the second appeal, Dobbin and Wagner and the BLNR appealed the judgment to the ICA, challenging the court's order vacating the BLNR's Amended Decision and locating the shoreline "approximately 20 feet mauka."

## V.

ICA Opinion

The ICA issued an order on August 25, 2011 granting Petitioners' motion to consolidate the first and second appeals, No. 30573 and CAAP 11–0000345, and ordering the parties to file briefs for CAAP–11–0000345. On August 31, 2012, the ICA issued its Memorandum Opinion in the consolidated cases on August 31, 2012. *Diamond v. Dobbin,* Nos. 30573 & CAAP–11–0000345, 128 Hawai'i 128, 2012 WL 3792024, at *1 (App. Aug. 31, 2012) (mem.). It observed that on a secondary appeal from an administrative agency decision,

the appellate court will utilize identical standards applied by the circuit court. Questions of fact are reviewed under the "clearly erroneous" standard. In contrast, an agency's legal conclusions are freely reviewable. An agency's interpretation of its rules receives deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose.

*Id.* (quoting *Hawai'i Teamsters & Allied Workers, Local 996 v. Dep't of Labor & Indus. Relations,* 110 Hawai'i 259, 265, 132 P.3d 368, 374 (2006)). First, the ICA concluded that the court had "engaged in unwarranted fact[-]finding and weighing of the evidence." *Id.* It held that, contrary to the court's conclusion 8, set forth *supra,* the BLNR did not "disregard" the evidence submitted by Petitioners.[23] *Id.* Rather, the BLNR found the findings of the DLNR and the State Surveyor that were based on the 2008 site visit, to be persuasive. *Id.* The ICA indicated that the BLNR had acknowledged in its Amended Decision that the DLNR and State Surveyor had identified a shoreline further mauka in response to the Galloway application, and that the BLNR had addressed this by noting that there was no evidence that the waves had extended to the October 19, 2005 shoreline in the previous two winters. *Id.* According to the ICA, the "BLNR was presented with adequate evidence supporting its ultimate shoreline determination, and as such, its findings were not clearly erroneous." *Id.* "Therefore," the ICA held, "the [ ] court erred in failing to give proper deference to [the] BLNR's findings of facts in certifying the shoreline boundary." *Id.*

Second, the ICA concluded that the court improperly characterized the BLNR's findings as only taking into consideration evidence from the current year's upper reaches of the wave. *Id.* at *5. In accordance with the BLNR's Amended Decision, the ICA reasoned that the BLNR "did not restrict its analysis of the upper reaches of the waves to the current year, but rather, 'took into evaluation all relevant factors present on the [p]roperty.'" *Id.* (brackets omitted). Thus, it held that the BLNR's analysis, taking into account all relevant factors, was not contrary to the definition of "shoreline boundary" in HRS § 205A–1, because both the debris line and vegetation line are "used as evidence to determine the shoreline, depending on the location and stability of each line." *Id.* (citing *Diamond,* 112 Hawai'i at 175, 145 P.3d at 718).

VI.

On December 3, 2012, Petitioners filed their Application to this court. They ask whether the ICA gravely erred (1) "in its [f]ailure to [c]onsider and [a]pply [this court's d]ecision in *Paul's Elec[trical] Serv[ice,] Inc. v. Befitel,* 104 Hawai'i 412, 91 P.3d 494 (2004)[,] . . . with respect to the 'deference,' if any, the [ ] [c]ourt should have afforded the [BLNR] in the [ ] [c]ourt's review of the BLNR's . . . location of the 'shoreline' pursuant to HRS [§ ] 205A–1, *et seq.*"; (2) "in its [i]nterpretation and [a]pplication of . . . [*Diamond I* ], with respect to the . . . determination of the shoreline . . . ."; and (3) "in [c]oncluding that the [ ] [c]ourt's 2010 Judgment in Civil No. 09–1–0197 [No. 30573] was [r]endered [m]oot when the BLNR filed its Amended Decision [ ] on May 21, 2010."[24]

**23.** Respectfully, the ICA opinion is not entirely clear as to which of the appeals it is addressing with respect to the court's "unwarranted fact finding," although it initially states that "we do not address the issues raised in [No.] 30573." 2012 WL 3792024, at *3. First, it states that the court engaged in unwarranted fact finding in its second appeal, and cites to findings 28 through 40 in that Decision and Order. *Id.* Then, the ICA states that "[b]ased on the evidence submitted by [Petitioners] the [ ] court concluded that . . . [,]" and quotes two conclusions from the court's April 6, 2010 Decision and Order in the first appeal. *Id.* at *4. Later in the opinion, the ICA identifies findings 27 through 38 and conclusions 8 and 9 from the first appeal, stating that the

court erred in making those determinations, and then quotes language that is found in the BLNR's conclusions in both the first and second appeal. *Id.* at *4–5.

**24.** On December 18, 2012, the BLNR filed a Response Brief (Response), arguing that the ICA properly determined that the court should not have made its own determinations by weighing the evidence on appeal, and that regardless of Petitioners' citation to *Paul's Electrical,* the BLNR should be afforded deference in its decision based on a multi-variable approach. The Response also alleged that the ICA properly determined that the BLNR's Amended Decision rendered the first appeal moot.

## VII.

■ Preliminarily, the mootness issue must be addressed, in as much as it affects the relevancy of the proceedings below to the instant appeal. "The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suitable for determination." *Wong v. Bd. of Regents, Univ. of Haw.*, 62 Haw. 391, 394, 616 P.2d 201, 203 (1980). Hence, "[a] case is moot if the reviewing court can no longer grant effective relief." *Kaho'ohanohano v. State*, 114 Hawai'i 302, 332, 162 P.3d 696, 726 (2007) (brackets in original) (citations omitted). However, this court has also "recognized an exception to the mootness doctrine in cases involving questions that affect the public interest and are 'capable of repetition yet evading review.'" *Diamond I*, 112 Hawai'i at 170, 145 P.3d at 713 (quoting *Okada Trucking Co., Ltd. v. Bd. of Water Supply*, 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002) (citations omitted)).

Petitioners allege in their Questions Presented and in footnote 3 of their Application, that the court's May 19, 2010 Judgment entered on the first appeal, No. 30573, is <u>not moot.</u> (Citing *Diamond I*, 112 Hawai'i at 171–72, 145 P.3d at 714–15.) *Diamond I* addressed a similar factual situation to the one presented here, involving shoreline certifications. As stated, under the relevant statutory scheme, a particular shoreline certification is only valid for one year. *See* HRS § 205A–42 ("[N]o determination of a shoreline shall be valid for a period longer twelve months.") In *Diamond I*, this court considered whether it could hear an appeal from a decision of the BLNR related to shoreline certification, despite the fact that the shoreline certification at issue had expired. 112 Hawai'i at 172, 145 P.3d at 715.

We determined the case was not moot because the shoreline certification satisfied the elements of the public interest exception to the mootness doctrine, specifically, it was "a matter of vast public importance" and was "'capable of repetition yet evading review.'" *Id.* (citing *Okada Trucking Co. v. Bd. of*

*Water Supply*, 99 Hawai'i 191, 196–97, 53 P.3d 799, 804–05 (2002)). Given that any shoreline certification would only be valid for one year, and that "the appeals process generally takes more than one year," *Diamond I* recognized that appellate review would be frustrated if it determined that the appeal was moot. Therefore, *Diamond I* applied the exception to the mootness doctrine.

This case is unlike *Diamond I* with respect to the mootness issue. None of the parties appear to dispute the issue of whether this court may hear the appeal from the BLNR's ultimate shoreline determination. Instead, the issue is simply whether this court still must consider the court's decision on appeal from the BLNR's first shoreline determination, No. 30573.

Here, the BLNR's May 21, 2010 Amended Decision replaced the BLNR's original June 19, 2009 Decision. The issuance of the Amended Decision effectively "destroyed justiciability" of the prior appeal from the court's judgment on the BLNR's June 19, 2009 Decision, inasmuch as the Amended Decision became the ultimate agency decision in effect regarding the shoreline certification on the property. Thus, any appeal from the original administrative agency Decision in No. 30573 was mooted because the BLNR's June 19, 2009 Decision is no longer effective. Instead, we will review the appeal from the May 21, 2010 Amended Decision of the BLNR.[25]

## VIII.

Petitioners argue that the ICA failed to consider *Paul's Electrical* when discussing what deference the court should have given to the BLNR. Respectfully, the ICA did err in setting forth part of its standard of review. In articulating that standard, the ICA stated that "an appellate court's review of an agency decision is 'qualified by the principle that the agency's decision <u>carries a presumption of validity and appellant has the heavy burden</u> of making a convincing showing that the decision is invalid because it is <u>unjust and</u>

---

**25.** However, we observe that the BLNR's June 19, 2009 Decision will be relevant to the extent necessary to determine the validity of the BLNR's Amended Decision, including whether the BLNR complied with the court's order on remand. *See* discussion *infra*.

unreasonable in its consequences.' " *Dobbin*, 2012 WL 3792024, at *3 (emphases added) (quoting *Paul v. Dep't of Transp.*, 115 Hawai'i 416, 426, 168 P.3d 546, 555 (2007)).

*Paul's Electrical*, however, clarified several aspects of the standard for appellate review of administrative agency actions, including the "presumption of validity", "heavy burden", and "unjust and unreasonable" language set out by the ICA in its memorandum opinion. *See* 104 Hawai'i at 417–20, 91 P.3d at 499–502. This court held in *Paul's Electrical*, first, that although "this court has frequently used the 'unjust and unreasonable' language as a proxy for the abuse of discretion standard . . . [,] the 'unjust and unreasonable' language has particular applicability only in the context of decisions of the Public Utilities Commission . . . ." 104 Hawai'i at 419, 91 P.3d at 501 (emphasis added). *See also Nakamura v. State*, 98 Hawai'i 263, 274–75, 47 P.3d 730, 741–43 (2002) (Acoba, J., concurring and dissenting) (observing that the history of the "unjust and unreasonable" language demonstrates its inapplicability to cases not involving the Public Utilities Commission. (citing *In re Application of Kauai Elec. Div. of Citizens Utilities Co.*, 60 Haw. 166, 179, 590 P.2d 524, 535 (1978))). Since this case does not involve the Public Utilities Commission, the "unjust and unreasonable" language is not applicable here. Second, *Paul's Electrical* held, with respect to the phrase, "the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing[,]" that "[a]gency determinations, even if made within the agency's sphere of expertise, are not presumptively valid[.]" *Id.* (emphases added); *see also Nakamura*, 98 Hawai'i at 273, 47 P.3d at 740 (Acoba, J., concurring dissenting) ("Presuming the validity of the [agency's] decision as to credibility and weight, or because of its 'expertise,' undermines the clearly erroneous rule imposed by [HRS § 91–14(g)(5) ]."). Thus, the language regarding the presumptive validity of an agency determination is not applicable in the instant case either. Therefore, in light of

this court's holding in *Paul's Electrical*, the ICA and Respondents erred when they articulated that standard of review.

■ Notwithstanding that error, the ICA correctly articulated the "clearly erroneous" standard with respect to the court's findings, *see Hawaii Teamsters*, 110 Hawai'i at 265, 132 P.3d at 374, and *de novo* review with respect to the court's conclusions of law, *id.*; *see also Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 307, 97 P.3d 372, 383 (2004) ("The courts may freely review an agency's conclusions of law.") (brackets, internal quotation marks, and citation omitted). Accordingly, we will review the court's findings of fact under the "clearly erroneous" standard and its conclusions of law under the *de novo* standard, without any particularized presumption of validity or need to consider whether the agency's decision was "unjust and unreasonable." *See Paul's Electrical*, 104 Hawai'i at 418–20, 91 P.3d at 499–502.

## IX.

■ Petitioners' first question presented also appears to challenge the ICA's conclusion that "[t]he [ ] court erred in substituting its judgment for [the] BLNR." *Dobbin*, 2012 WL 3792024, at *5 (emphasis added). It is well-established that when a circuit court reviews an agency determination under HRS § 91–14, that court acts as an appellate court. Pursuant to HRS § 91–14(f), a review of an agency decision "shall be conducted by the appropriate court . . . and shall be confined to the record." Under HRS § 91–14(g), findings of fact are reviewable as to whether an agency's decision is clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. *Morimoto v. Bd. of Land & Natural Res.*, 107 Hawai'i 296, 302, 113 P.3d 172, 178 (2005).

Respectfully, the court went beyond determining whether particular conflicting findings were clearly erroneous, and instead made its own factual findings on appeal from the BLNR's Amended Decision.[26] The court

26. In its Opening Brief to the ICA, the BLNR argues that the court erred in considering the evidence attached by Petitioners to their brief to the court on appeal. The BLNR states that,

"[a]lthough the declarations appear to be the same declarations that were submitted in [Petitioners'] briefs before the [BLNR], no statement to that effect was contained in any of the [Peti-

did not err in stating its conclusions, however, as those adhered to the standards for appellate review as set forth above. For example, unlike the court's findings, which are designated in its decision as "Findings of Fact,"[27] the court's conclusions state that particular findings from the BLNR's Amended Decision were "clearly erroneous." However, as discussed *infra*, the court was correct in holding that certain findings in the BLNR's Amended Decision were clearly erroneous.[28]

## X.

To reiterate, HRS § 205A–42(a) states that:

The [BLNR] shall adopt rules pursuant to chapter 91 prescribing procedures for determining a shoreline and appeals of shoreline determinations that are consistent with subsection (b); provided that no determination of a shoreline shall be valid for a period longer than twelve months, except when the shoreline is fixed by artificial structures that have been approved by appropriate government agencies and for which engineering drawings exist to locate

the interface between the shoreline and the structure.

(Emphasis added.) The rules adopted by the BLNR are also subject to the definition of "shoreline" in HRS § 205A–1. The regulations promulgated by the BLNR as to shoreline certifications can be found at HAR chapter 13, subchapter 222. In deference to the statutory definition, HAR § 13–222–2 defines "shoreline" the same as HRS § 205A–1 does. A " '[s]horeline certification' " is defined as "a signed statement by the chairperson of the [BLNR] that the shoreline is as located and shown on the map as of a certain date." HAR § 13–222–2.

While HRS § 205A–42 limits the validity of a shoreline certification to one year, a particular certification may have consequences lasting beyond one year, because the purpose of a shoreline determination is "to standardize the application procedure for shoreline certifications for purposes of implementing the shoreline setback law and other related laws." HAR § 13–222–1 (emphasis added). As related, "shoreline setback lines" are established running parallel to the "shoreline[,]" as certified by the BLNR. *See* HRS § 205A–43(a) (1993) ("Setbacks along

---

tioners'] briefs submitted to the [ ] court." The appendix material provided by the Petitioners was identical to that in the record on appeal, however, and thus, although the court failed to cite to the record and instead cited to the appendices to the briefs, any error on the part of the court was harmless.

**27.** The court articulated these factual determinations in the following findings in its February 16, 2011 decision on the second appeal:

32. Subsequent to the planting of the naupaka and beach heliotrope trees, [Petitioners] also observed and photographed irrigation lines on Lot 12, which were used to water the newly planted vegetation. [ ]
33. The vegetation planted on Lot 12 during December, 2003, and January and February, 2004 has been artificially induced by human intervention and does not represent evidence of the shoreline.
. . . .
36. The beach fronting [the property] is currently covered with salt tolerant naupaka and beach heliotrope trees planted by the prior owner to create an artificial shoreline.
39. The naupaka and beach heliotropes planted on [the property] act as a barrier that prevents and/or hinders the observation of the

true debris line that evidences the "upper reaches of the wash of the waves at high tide during the season of the year in which the highest wash of the waves occurs."
40. The evidence submitted by the [Petitioners], including the photographs, clearly shows that the "upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs" reaches further mauka onto [the property] than the BLNR's "current" location of the shoreline at the "dune crest."

(Emphases added.)

**28.** In the court's conclusion 1, it indicated that the BLNR's findings 27, 34, 35, 36, 38, 40, 41, 46, 48, 50, 51, 52, 53, 56, 58, 59, 60, 66, 68, 69, 70, 72, and 73 in the BLNR's Amended Decision were "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." The court also stated, at conclusion 2, that the BLNR's conclusions 4, 9, 10, and 11 were "in violation of HRS § 205A–1, in excess of the BLNR's statutory authority or jurisdiction, affected by other errors of law, and clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." Some, but not all, of the findings that the court indicated were clearly erroneous are addressed *infra*.

shorelines are established of not less than twenty feet and not more than forty feet inland from the shoreline."). The "shoreline setback lines", in turn, dictate where certain structures can be built in relation to the seashore. *See* HRS § 205A–44 (stating that "[e]xcept as provided in this section, structures are prohibited in the shoreline area without a variance pursuant to this part."). Thus, if the shoreline setback line is dependent upon the shoreline certification, then structures may or may not be built in a particular area depending on where that certification is located. Such structures would presumably be in existence for more than one year. Hence, the shoreline determination can be a significant designation, resulting in ramifications for more than just one year.

Moreover, the location of a "shoreline" can be relevant to the well-established public right of access to Hawai'i's shorelines. *See* HRS § 115–4 (1993) (providing for the right of transit along the shorelines). HRS § 115–5(a) (1993) states that "[t]he right of transit shall exist seaward of the shoreline and this area shall be defined as a beach transit corridor. For purposes of this section, 'shoreline' shall have the same meaning as in section 205A–1." (emphasis added). The right of the public to access a beach transit corridor is not at issue in this case. However, inasmuch as the definition of "shoreline" is identical for purposes of both statutes, an agency's interpretation of that definition in shoreline certification cases may ultimately impact the ability of the public to access certain areas along the sea.

### XI.

■ As explained *infra*, it is axiomatic that the "longstanding public use of Hawaii's beaches ... has ripened into a customary right", and that accordingly, "public policy ... favors extending public use and ownership to as much of Hawaii's shoreline as is reasonably possible." *Sotomura*, 55 Haw. at 182, 517 P.2d at 61–62. The decisions of this court regarding the location of the shoreline, of which *Diamond I* is the latest, reflect

these principles. Correspondingly, we turn to such propositions for guidance in evaluating the instant case.

In 1968, this court issued *Ashford*, an opinion by Chief Justice Richardson, which set forth many of the foundations underlying future shoreline determinations. *Ashford* considered the location of a property that was described in the royal patents as running "ma ke kai," or "along the sea". 50 Haw. at 314, 440 P.2d at 77. The appellee contended that the phrase described the boundary represented "by the intersection of the shore and the horizontal plane of mean high water based on publications of the U.S. Coast and Geodetic Survey." *Id.* at 77, 440 P.2d at 314–15. This court disagreed, instead holding that "me kai kai" was "along the upper reaches of the wash of the waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves[.]" 50 Haw. at 315, 440 P.2d at 77. *Ashford* also held that the testimony of "[t]wo kama'aina[29] witnesses, living in the area of appellees' land," was relevant to determining the shoreline property boundary. *Id.* at 316, 440 P.2d at 77–78. The shoreline boundary designation stated in *Ashford* as "the upper reaches of the wash of the waves," was later codified in HRS chapter 205A. 1975 Haw. Sess. Laws Act 176, § 1 at 386.

In 1973, in *Sotomura*, another opinion by Chief Justice Richardson, the boundaries of a property were again at issue. 55 Haw. at 178, 517 P.2d at 59. A county surveyor located the seaward boundary "between the private upland and public beach" at "the upper reaches of the wash of the waves", which he determined was along the debris line, in accordance with *Ashford*. *Id.* at 180, 517 P.2d at 61. The land court agreed. *Id.*

Importantly, *Sotomura* stated that "[t]he *Ashford* decision was a judicial recognition of long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right." *Id.* at 181–82, 517 P.2d at 61 (citation omitted). It further established that "[p]ublic policy, as interpreted by this court, favors extending to

---

29. "Kama'aina" can be defined as "[n]ative-born, one born in a place, host; native plant; acquainted, familiar." Pukui & Elbert, *Hawaiian Dictionary* at 124.

public use and ownership as much of Hawaii's shoreline as is reasonably possible." 55 Haw. at 181, 517 P.2d at 61–62 (emphasis added). In accordance with these principles, then, *Sotomura* held as a matter of law that "where the wash of the waves is marked <u>by both a debris line and a vegetation line lying further mauka</u>[,] the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of <u>the vegetation growth</u>." *Id.* at 182, 517 P.2d at 62 (emphases added).

This line of cases was extended by *Diamond I*, which further clarified the definition of "shoreline," first set forth in *Ashford* and currently defined in HRS § 205A–1 and HAR § 13–222–2, with respect to shoreline determinations made pursuant to HRS § 205A–42. 112 Hawai'i at 174, 145 P.3d at 718. The shoreline certification at issue in *Diamond I* was for another property in the same subdivision as the property in the instant case. *Id.* at 164, 145 P.3d at 707. After a 2002 survey and shoreline determination by the BLNR, the plaintiffs in *Diamond I* appealed, and the BLNR entered its "Findings of Fact, Conclusions of Law, and Decision and Order" stating, *inter alia,* as follows:

> 63. <u>Naupaka is an ideal indicator of the upper wash of the waves</u> because of its salt tolerance and <u>ability to withstand occasional salt water inundation,</u> such as may be found in storm or other unusually high wave conditions, while not surviving if constantly inundated or subjected to ripping or undermining by wave action.
>
> . . . .
>
> 78. The practice of the State Surveyor is to use the line of vegetation where present, and not the line of debris, as evidence of the upper wash of the waves, due to the [sic] greater stability.
>
> . . . .
>
> 11. The edge of the vegetation growth is the best evidence of the shoreline in this case . . . as against a debris line which may change from week to week or from day to day.
>
> . . . .
>
> 18. The . . . field survey was correct because, among other things: (1) the age of the vegetation around the stakes indicated that it was naturally rooted and growing; (2) <u>there was no evidence that the vegetation was being artificially maintained</u> . . . [.]

*Id.* at 166–67, 145 P.3d at 709–10 (emphases added). The contested shoreline certification then expired, a new application was filed in 2003, and the BLNR certified the shoreline at the same location. *Id.* at 167, 145 P.3d at 710. The plaintiffs appealed this proposed certification, and the BLNR filed an Order Denying Appeal, that stated, in relevant part,

> Stable vegetation are plants that, without continued human intervention, are well-established and would not be uprooted, broken off, or unable <u>to survive the occasional wash or run-up of waves.</u>
>
> The fact that at one time the vegetation here was planted by human hands does not nullify the use of the stable vegetation line to determine the location of the shoreline for certification purposes. <u>Vegetation that, even though originally induced,</u> is able to survive through the seasons over several years without human intervention <u>provides a good indication of the location of the shoreline.</u>

*Id.* (emphases added).

In support of its actions, the BLNR had argued that *Sotomura* indicated that the vegetation line was the more stable indicator of the shoreline and thus should be prioritized in all cases when making shoreline determinations. *Id.* at 169, 145 P.3d at 712. *Diamond I* disagreed, holding instead that as a matter of statutory interpretation, the plain language of HRS § 205A–1 [30] required that the shoreline should be "certified at the highest reach of the highest wash of the waves[,]"

---

30. The last clause in the definition of "shoreline" was at issue in *Diamond*. 112 Hawai'i at 171, 145 P.3d at 714. To reiterate, HRS § 205A–1 states:

"Shoreline" means the upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, <u>usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.</u>
(Emphasis added.)

whether that was indicated by the debris line or the vegetation line. *Id.* at 173, 145 P.3d at 716 (emphasis added). It also held that this interpretation was consistent with *Sotomura,* inasmuch as the statement in *Sotomura* that the vegetation line is a "more permanent monument," supported the *Sotomura* court's decision to use the vegetation line because it was the furthest mauka. *Id.* at 175, 145 P.3d at 718.

Thus, *Diamond I* concluded that *Sotomura* does not indicate that the vegetation line will always prevail over the debris line. *Id.* Instead, the court in *Diamond* held that "the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of the vegetation growth," if that vegetation line is further mauka than the debris line. *Id.* at 174, 145 P.3d at 717.

*Diamond I* also considered the type of "vegetation growth" that can constitute a "vegetation line" for purposes of evidencing the shoreline. *Id.* at 175, 145 P.3d at 718. The vegetation at issue in *Diamond I* was naupaka, the same type of vegetation at issue in the instant case. *Id.* at 166, 145 P.3d at 709. "Vegetation line" was defined in HAR § 13–222–2, as " 'any plant, tree, shrub, grass or groups, clusters, or patches of the same, naturally rooted and growing.' " *Id.* (emphasis in original). In connection with whether the BLNR was correct in deciding that artificially induced naupaka could constitute a "vegetation line," this court noted that " 'the agency's decision must be consistent with the legislative purpose[ ]' " of HRS Chapter 205A. *Id.* (quoting *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

*Diamond I* then reviewed the objectives and policies of HRS chapter 205A, including "to '[p]rotect beaches for public use and recreation[,]' " *id.* (brackets in original) (quoting HRS § 205A–2(b)(9)) and to:

"(A) Locate new structures inland from the shoreline setback to conserve open space, minimize interference with natural shoreline processes, and minimize loss of improvements due to erosion;

(B) Prohibit construction of private, erosion protection structures seaward of the shoreline, except when they result in improved aesthetic and engineering solutions to erosion at the sites and do not interfere with existing recreational and waterline activities[.]"

*Id.* (brackets in original) (quoting HRS § 205A–2(c)(9)).

*Diamond I* concluded that "[t]he utilization of artificially planted vegetation in determining the certified shoreline encourages private land owners to plant and promote salt tolerant vegetation to extend their land further makai[.]" Thus, *Diamond I* held, "[m]erely because artificially planted vegetation survives more than one year does not deem it 'naturally rooted and growing' such that it can be utilized to determine the shoreline." *Id.* (emphasis added). *Diamond I* overturned the BLNR's order denying appeal in that case, noting that the order had "explicitly rejected the placement of the shoreline at the highest wash of the waves during high season[,]" and instead located the shoreline at the vegetation line, notwithstanding the possibility that a debris line may have been more representative of the highest wash of the waves, and the fact that the vegetation had been planted and irrigated. *Id.* at 176, 145 P.3d at 719.

## XII.

■ In Petitioners' second question, they challenge the merits of the BLNR's shoreline determination decision. As to this question, we conclude that the BLNR's ultimate shoreline determination is invalid because the agency made errors of fact and errors of law in its Amended Decision. The BLNR's errors of law are discussed first. Under HRS § 91–14(g), conclusions of law are reviewable for whether they are in violation of constitutional or statutory provisions; are in excess of the statutory authority or jurisdiction of the agency; or are affected by other error of law. *See Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (citing HRS § 91–14(g)).

### A.

■ The BLNR's first error of law was with respect to its use of historical evidence.

We conclude that the BLNR <u>must</u> consider historical evidence in making its shoreline determination. The BLNR apparently concedes this point, but in its first decision did not take into consideration any evidence beyond the one year's wash of the waves.[31]

The BLNR failed to properly follow the court's instruction on remand that HRS § 205A–1 does not limit the agency's analysis of the upper reaches of the wash of the waves "for only the 'current' season...."[32] As noted, in its April 6, 2010 decision on the first appeal, the court stated that "[t]he BLNR's interpretation of HRS § 205A–1, [ ] that only the 'current' year's evidence of the upper reaches of the wash of the waves should be considered in determining the shoreline ... conflicts with and/or contradicts the purpose and intent of HRS § 205A–1[ ]."[33] At the oral argument on the second appeal to the court, the court discussed with the BLNR's attorney whether the agency had in fact taken into account historical evidence of the upper reaches of the wash of the waves.

> THE COURT: Okay. So you would agree with [Petitioners' attorney] then that the certification itself lasts for one year, however, <u>the State is not restricted to looking at data for that one year period only?</u>
>
> [Counsel for BLNR]: Oh, yeah—
>
> THE COURT: You would agree with him?

[Counsel for BLNR]: <u>Yeah, I agree that we're not restricted to looking at only that one year period</u> and we have not restricted the, you know, the evidence that they've considered to a one year period, because I think even in the surveyor's report there's a statement that says, you know, <u>the past historical data used to—to indicate the change in condition or the conditions of the shoreline, you know, so, it may not be used to say, well, the shoreline, you know, was here five years ago so it should be here now. But it's used to show how the shoreline is moving in that area and what the trends in that area are.</u>

THE COURT: Then given that position, <u>I would assume then that the State would consider 12 years' worth of people who live in the area</u> and pictures that they've taken of the shoreline.

[Counsel for BLNR]: They—we're not disagreeing that that kind of evidence is relevant and that it should be looked at. We don't disagree with that. <u>I think the problem is that the evidence that was presented in this particular case was not—was not probative</u> because it didn't—it didn't contain, I guess enough—it wasn't substantial enough.

(Emphases added.)

Contrary to what counsel suggested in oral argument, the BLNR did not fully consider historical evidence when it made the findings in its Amended Decision. Although it removed the findings from its initial decision

---

**31.** Although we determined that the <u>appeal</u> from the BLNR's first decision is moot, as observed *supra*, we may consider the BLNR's first decision for purposes of determining the validity of the BLNR's Amended Decision.

**32.** In COL No. 5 of the BLNR's Amended Decision, it quotes the relevant statute and regulation to define "shoreline" as: "[T]he <u>upper wash of the waves,</u> other than storm and seismic waves...." (Emphasis added.) The correct definition, in relevant part is that " '[s]horeline' means the <u>upper reaches of the wash of the waves,</u> other than storm and seismic waves...." HRS § 205A–1; HAR § 13–222–2 (emphasis added).

It is worth noting that the word "reaches" in this context would mean "to extend to" or "to get up to or as far as". *Merriam Webster's Collegiate Dictionary* 972 (10th ed. 1993). Moreover, "reaches", in plural, suggests more than one wash of the waves, and thereby is consistent with the requirement, discussed *infra*, that the agency consider historical evidence of the wash of the waves.

**33.** As indicated, the BLNR argued before the court on both appeals, and to the ICA, that its interpretation of HRS § 205A–1 required that only the "current year's" evidence of the highest wash of the waves be taken into account in making a shoreline determination. However, in its Response to this court, the BLNR does not argue its earlier interpretation of HRS § 205A–1, but rather states that "[t]he ICA properly determined that the 'BLNR did not restrict its analysis of the upper reaches of the waves to the current year, but rather took into evaluation all relevant factors present on the [p]roperty.' " (Quoting *Dobbin*, 2012 WL 3792024, at *5) (internal quotation marks and brackets omitted).

discussing only the "current year's" wash of the waves, the BLNR's discussion of historical evidence in its Amended Decision appears to be a post hoc justification of its earlier decision.

In its first decision, the BLNR adopted the State Surveyor's recommendation in full. In that decision, the BLNR stated that it <u>did not consider historical evidence</u> other than the current year's wash of the waves. In fact, the BLNR stated in its first decision that "given the variable and temporary nature of shorelines, [Petitioners'] insistence on solely utilizing historical evidence in the determination of a shoreline <u>may result in inaccurately locating the upper reaches of the wash of the waves in a given year</u>." (Emphasis added.)

However, in its Amended Decision, the BLNR stated that the State Surveyor's initial recommendation from his May 28, 2008 letter was "based, at least in part, on the Galloway [A]pplication ... [,]" despite the fact that the Galloway Application was not mentioned at all in the BLNR's first decision. If, in fact, the State Surveyor had considered the Galloway Application as historical evidence, his recommendation, which the BLNR purportedly adopted in its first decision as the appropriate shoreline location, would be based on factors that were inconsistent with the approach to shoreline certification that the BLNR articulated in its first decision. In other words, in its first decision, the BLNR stated that only the current year's evidence could be considered in making shoreline determinations, but in its Amended Decision, it maintained that historical evidence had in fact been considered in its first decision setting forth the proposed shoreline.

The Amended Decision also improperly limited its consideration of "historical evidence" to the past two winters. With respect to the evidence of the Galloway Application, it stated that, "[t]he State Surveyor and DLNR staff also noted that there was no evidence that the wash of the waves had extended that far mauka <u>in the past two winters</u>, <u>especially not</u> during the immediately preceding winter season." (Emphasis added.) However, the court's decision on the first appeal stated several times that Petitioners had observed the shoreline for the past eight years. This statement from the court's findings, combined with the court's mandate that the BLNR consider more than just the "current year's" evidence of the highest wash of the waves, indicates that the court instructed the BLNR to consider <u>all</u> historical evidence, rather than just the historical evidence that the BLNR felt was appropriate. Thus, where there was evidence of prior years' "wash of the waves," the agency <u>must</u> consider the evidence from those years when making the shoreline determination.

This comports not only with the instructions of the court on remand, but also with this court's decision in *Ashford*, which held that "reputation evidence by kama'aina witnesses" must be allowed in determining the "public and private boundary dividing private land and public beaches." *Ashford*, 50 Haw. at 316, 440 P.2d at 78. Thus, the BLNR was wrong when it used only the historical evidence from the two preceding winter seasons to determine the "highest wash of the waves," rather than evaluating historical evidence of the past eight years for which Petitioners provided testimony of their observations. HRS § 205A–1. We therefore also expressly reject Dobbin and Wagner's contention that "the ultimate determination of the upper reaches of the wash of the waves at high tide ... is [solely] one for experts and those qualified under the law." This is wrong as a matter of law.

### B.

Second, in the instant case, the BLNR's Amended Decision posits a "multi-variable" approach to shoreline certifications, as set forth in the following findings:

24. It is the current practice of the DLNR and the State Surveyor to use a multi-variable approach to determining the location of the upper wash of the waves for shoreline certification purposes. <u>The multi-variable approach takes into consideration all pertinent and appropriate evidentiary factors in a shoreline setting,</u> based on the shoreline type (sand beach, perched beach, cliff, rocky shoreline, etc., or a combination thereof), location (north-, south-,

east-, or west-facing shore), and exposure to large waves (protected within a cover or a bay or by rock outcroppings or reefs, or located within the protective shadow of other islands, versus exposed to the open ocean).

25. Some of the evidential variables used by the DLNR and State Surveyor include, without limitation, debris lines, vegetation lines, wet lines, artificial structures, dune crests, erosion scarps, salt deposits, discoloration, and saltwater-dependent biota.

26. The DLNR and State Surveyor also consider other features or facts unique to each shoreline and makes appropriate adjustments to the interpretation of the evidence as those features or facts are determined by the DLNR and State Surveyor to affect the natural movement of the wash of the waves within the subject shoreline area. Such features and facts include the presence and effect of artificially induced vegetation or artificially created topographic anomalies that are not representative of the overall trends of the natural shoreline in the subject shoreline area.

27. The DLNR and State Surveyor also incorporate in their shoreline determination, any pertinent information about the shoreline that is presented by the owner of the subject property and any other member of the public that has personal knowledge and familiarity with the shoreline conditions of the subject property during high surf conditions in the season of high surf.

(Emphases added.)

This multi-variable approach is not described in the statute or in the relevant case law. The approach the BLNR should have followed is set out in HRS § 205A–1, defining shoreline, and this court's jurisprudence. *See Diamond I*, 112 Hawai'i at 172–73, 145 P.3d at 715–16 (holding that where the shoreline is marked by both a vegetation line and a debris line, the line further mauka is used to locate the shoreline); *Sotomura*, 55 Haw. at 181–82, 517 P.2d at 61–62 (locating a 'high water mark' property boundary at the vegetation line where that line was further mauka); *Ashford*, 50 Haw. at 316, 440 P.2d at 78 (holding that the location of the boundary

dividing private land from public beaches "was along the upper reaches of the waves as represented by the edge of vegetation or the line of debris."). Any factors identified by the BLNR must be consistent with our case law, and require that the shoreline be located at the debris line or vegetation line, whichever is furthest mauka. *Diamond I*, 112 Hawai'i at 172, 145 P.3d at 715. Any approach undertaken by the BLNR must be executed in accordance with this basic precept. *See id.* at 169, 145 P.3d at 712 (holding that " 'the *Ashford* decision was a judicial recognition of the long-standing public use of Hawai'i's beaches to an easily recognizable boundary that has ripened into a customary right[,]" and accordingly, the boundary markers for the shoreline must be " 'easily recognizable' " and " 'known to the people living thereon or in the neighborhood.' ") (emphasis in original) (quoting *Sotomura*, 55 Haw. at 181–82, 517 P.2d at 61).

C.

1.

██ Third, pursuant to *Diamond I*, "vegetation growth" does not include salt-tolerant plants planted on the property for the purpose of shoreline demarcation, nor the natural expansion of such growth. 112 Hawai'i at 175, 145 P.3d at 718. Although in this case there is a dispute over the extent to which the plants were artificially induced, it is undisputed that salt-tolerant plants were in evidence on the property. However, the BLNR's Amended Decision does not indicate how it considered the presence of these salt-tolerant plants in making its decision. On remand, the BLNR must comply with *Diamond I*'s holding that does not allow the use of salt-tolerant vegetation as an indication of the "vegetation line." *Id.*

2.

Relatedly, there is also no indication in the Amended Decision of whether the BLNR took artificial barriers into consideration. In *Diamond I*, this court instructed that one of the objectives of HRS chapter 205A was to " [p]rohibit construction of private erosion-protection structures seaward of the shore-

line, except when they result in improved aesthetic and engineering solutions to erosion at the sites and do not interfere with existing recreational and waterline activities.'" *Id.* (quoting HRS § 205A–2(c)(9)). *Diamond I* barred the use of artificially induced plants as an indication of the shoreline, because the use of such a false vegetation line in making a shoreline determination would allow landowners to effectively erect an artificial "barrier" extending their land further makai. *Id.* This would be contrary to the objectives behind HRS chapter 205A. Yet, the BLNR's Amended Decision is bereft of any indication of how the policies of HRS § 205A–2(c)(9) [34] have been enforced, reflecting a disregard of the standards set forth in *Diamond I*, *Sotomura*, and *Ashford.*

HAR § 13–222–2 defines "vegetation growth" as "any plant, tree, shrub, grass or groups, clusters, or patches of the same, naturally rooted and growing." (Emphasis added.) The BLNR's decision did not take this definition, specifically the "naturally rooted and growing" portion, into consideration when it decided the naupaka and other plants could be used as an indicator of the shoreline. Both sides submitted evidence on this issue, and at FOF No. 69, the BLNR concluded that "Appellees Dobbin and Wagner's Opening Brief [sic] [to the BLNR] refuted the assertions that the vegetation growing along the shoreline was planted and 'induced' with the aid of irrigation."

But, there was no support for this finding. The BLNR cited to Dobbin and Wagner's Answering Brief, which stated only that the sprinklers located on the property were not "aimed towards nor intended to irrigate the naturally growing shoreline vegetation." [35] However, in order to determine whether the vegetation was "naturally rooted and growing" in accordance with the HAR § 13–222–2 definition, the BLNR must determine that the shoreline vegetation was actually "naturally growing", which requires more than a

conclusion that the sprinklers were not "aimed at or intended to irrigate" the vegetation. If the sprinklers' action actually resulted in watering the vegetation as a result of the wind or other natural factors, then it is of no import whether the sprinklers were not "intended to irrigate" the vegetation.

### 3.

Moreover, in this case, the BLNR Amended Decision states only that the State Surveyor and DLNR considered "the presence and effect of artificially induced vegetation or artificially created topographic anomalies[.]" It is not evident from the decision how the presence of potentially artificial barriers affected the BLNR's determination of the "highest wash of the waves." HRS § 205A–1. *See Kilauea Neighborhood Ass'n v. Land Use Comm'n*, 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988) ("An agency's findings must be sufficient to allow the reviewing court to track the steps by which the agency reached its decision."); *In re Water Use Permit Applications*, 105 Hawai'i 1, 27, 93 P.3d 643, 669 (2004) (Acoba, J., concurring) ("The purpose behind findings is to assure reasoned decision making by the agency and enable judicial review of agency decisions." (internal quotation marks and citations omitted)).

Additionally, the BLNR's Amended Decision locates the shoreline at "the makai edge of the hedge." According to the BLNR's finding 36(e), this is the area where naupaka and beach heliotrope are located, along with debris. *Diamond I* mandates that, as between the debris and the vegetation line, the shoreline must be located at the line that is further mauka. 112 Hawai'i at 174–75, 145 P.3d at 717–18. The Amended Decision states at finding 61 that, "[Petitioners] argued that the use of naupaka or other salt tolerant plants to create an artificial shoreline prevents or hinders the observation of the true evidence of the debris line created by the upper wash of the winter waves."

---

**34.** HRS § 205A–2 (Supp.2001) sets forth the objectives and policies for the Coastal Zone Management Program. Among these is HRS § 205A–2(c)(9)(D), which states that in connection with beach protection, it is a policy to "[p]rohibit private property owners from creating a public nuisance by inducing or cultivating

the private property owner's vegetation in a beach transit corridor."

**35.** There was also some inconsistency between the affidavits provided by Respondents regarding the location of the sprinklers.

Petitioner Diamond's Declaration also states that "[a]t the site visit on April 18, 2008, I pointed out the current condition of the naupaka as obvious evidence that the highest wash of waves had in fact washed through and into the planted vegetation."

However, in its Amended Decision, the BLNR seemingly did not take into account whether the debris line was located at the same place as the vegetation line because the debris line was, as Petitioners suggest, being hindered by the presence of salt-tolerant vegetation. Although the Amended Decision suggests that debris is located in the vegetation, it included no findings as to whether the vegetation line or the debris line is located further mauka. It would be contrary to *Diamond*, the policy articulated in *Sotomura*, and the legislative purpose behind HRS chapter 205A, as noted *supra*, to locate the shoreline where salt-tolerant plants had been grown and had prevented a debris line from forming that was indicative of the true "highest wash of the waves."

### D.

▮ Fourth, the BLNR apparently disregarded the Wichman testimony submitted by Petitioners, on the basis that first, it "was not in the form of an affidavit or declaration," second, it "was not attested to by anyone nor was any context for the document provided by [Petitioners]," and third, that "[i]t is not clear from the document or [Petitioners'] Opening Brief [to the BLNR] whether the person who allegedly authored the document is an expert or what his expertise might be, if any." The BLNR's disregard for this testimony is manifestly contrary to HRS chapter 91.

A shoreline determination is a contested case hearing. *See Diamond I*, 112 Hawai'i at 165, 145 P.3d at 708. With respect to evidence adduced in contested case hearings,

HRS § 91–10 (Supp.2003) provides in relevant part that:

In contested cases:
(1) Except as provided in section 91–8.5[36], any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence.

(Emphases added.) The BLNR made an implicit finding that the Wichman testimony was not reliable, apparently because of the format of the document. But it is elemental that contested case hearings do not require that evidence presented to the BLNR must be in the form of an affidavit or declaration, or "attested to." Instead, under the statute, "any oral or documentary evidence may be received" unless such evidence is "irrelevant, immaterial, or unduly repetitious". HRS § 91–10. There is nothing in the record to indicate that the Wichman testimony was "irrelevant, immaterial, or unduly repetitious." The BLNR erred as a matter of law in entirely disregarding the testimony.

Additionally, the BLNR's findings of fact with respect to Wichman's testimony are clearly erroneous. The BLNR states that "it is not clear ... whether the person who allegedly authored the document is an expert or what his expertise might be, if any." First, it would not necessarily matter whether Wichman was an expert.[37] Pursuant to this court's decision in *Ashford*, the testimony of kama'aina witness is relevant in locating the shoreline, and Wichman stated that "[a]ll [his] life [he] has been an active surfer, diver and fisherman and know[s][sic] the ocean and beaches here in Ha'ena and Wainiha very well."

---

36. HRS § 91–8.5 (Supp.2003) is not relevant to this case.

37. In the BLNR's first decision, its findings state that "[w]hile Mr. Wichman's testimony appears to be presented as expert testimony regarding vegetation, there is no evidence that he is qualified to testify as an expert on such features as the 'highest wash of the waves' that are determined by coastal geology or ocean dynamics." The BLNR gives no indication of why the Wichman testimony could no longer be deemed "expert testimony" when it made its Amended Decision. Thus, the notion that Wichman's testimony was not "expert" appears to be a post hoc justification to disregard that testimony altogether.

**34**

Second, the Wichman testimony states that he has worked for the National Tropical Botanical Garden since 1976, and is the director of the Limahuli Garden and Preserve. Under these circumstances, the BLNR's outright dismissal of the Wichman testimony, because "[i]t is not clear ... whether the person who allegedly authored the document is an expert or what his expertise might be, if any[,]" is not only clearly erroneous, but manifestly wrong as a matter of law. *See Ashford*, 50 Haw. at 316, 440 P.2d at 77 (holding that "Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice, and usage[,]" and therefore, reputation evidence by kama'aina witnesses may be used in land disputes).

### XIII.

#### A.

The ICA also erred in vacating the court's decision and affirming the BLNR's Amended Decision because, as the court observed, many of the agency's findings of fact were clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record. *See* HRS 91–14(g)(5). A finding of fact is "clearly erroneous" when " '(1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made.' " *Del Monte Fresh Produce, Inc. v. Int'l Longshore & Warehouse Union, Local 142*, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)). To determine whether evidence is substantial evidence, it must be "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks and citations omitted).

#### B.

In the instant case, the BLNR made a number of clearly erroneous findings with respect to Petitioners' declarations and the attached photographs. Findings 48 through 56, discussing the evidence presented by Petitioners, are incorrect and/or inconsistent and thus undermine the final determination by the BLNR. First, finding 52 stated that "[the Blair declaration] did not contain any information as to the dates when specific photographs were taken or who took the photographs." This is clearly erroneous in light of the Blair declaration, which stated, *inter alia*, that "[t]he photograph attached hereto as Exhibit 'E' was taken on October 19, 2005, and shows Chris L. Conger identifying the location of the shoreline as recommended by the State Surveyor on October 19, 2005." (Emphasis added.) The BLNR's finding 51 stated that "it is not possible to ascertain from [the Blair declaration] what was the object of the specific photographs or what they were purported to portray." (Emphasis added.) To the contrary, the Blair declaration stated that "the photographs attached hereto as Exhibits 'G' through 'N' are true and correct copies, and accurately show the upper reaches of the waves ... on the Dobbin property."

At finding 48, the BLNR states that "[t]he photographs contained in Exhibits G through N of [Petitioners'] Opening Brief are date stamped, either on the photos or in the captions, with dates falling between 2004 and 2008." (Emphasis added.) But, in contradiction of finding 48, at finding 53, the BLNR stated that "[w]ithout having made any reference to specific observations as to the location of the highest wash of the waves, [Petitioner] Blair testified that ... the shoreline should be located twenty feet mauka of the proposed shoreline," and at finding 56, it stated that "[the Blair Declaration] and [the Diamond Declaration] do not clearly identify what each photograph is purported to depict." (Emphases added.) These last two observations are inaccurate in light of the fact that the photographs, some dated, were also attached to the briefs as exhibits, and in light of the actual Blair Declaration that provided some specifics as to what the photos depict and what locations were relevant. Based on these errors in considering the points discussed by Petitioners in their declarations, it is obvious that "the record lacks substantial evidence" to support these findings. The BLNR apparently rejected altogether Petitioners' evidence of the location of the shoreline, thereby ignoring substantial historical evidence of the shoreline's location.

## XIV.

Finally, the BLNR's Amended Decision reflects an abuse of discretion because it arbitrarily and capriciously failed to follow the instructions of the court on remand from its earlier decision. Pursuant to HRS § 91–14(g)(6), an agency's exercise of discretion is reviewable as to whether it is "[a]rbitary, or capricious, or characterized by an abuse of discretion or clearly unwarranted exercise of discretion." *See Sullivan,* 87 Hawai'i at 228, 953 P.2d at 1326. In the instant case, the BLNR failed to follow the proper instructions of the court on remand with respect to its Amended Decision.

At oral argument before the court on the second appeal, the following colloquy took place between the court and the attorney for the BLNR:

[Counsel for BLNR]: Exactly. What it was [the BLNR was] taking, based on the [c]ourt's, you know, findings and the directions from this [c]ourt, they were taking a new hard look at the evidence that was actually presented in the initial case.

THE COURT: As opposed to what kind of look that was initially taken?

[Counsel for BLNR]: I mean, they did take it. I mean, they did consider it. You know, it was this [c]ourt that disagreed with their characterization of the evidence, so they looked at it again, and—

THE COURT: Ms. Chow, let me just, I want to make sure that I'm absolutely clear on this point. Okay.

Upon remand, this [c]ourt stated that the matter is remanded to the BLNR with specific instructions to appropriately consider and give due weight to [Petitioners'] proposed evidence and to correctly apply applicable statutes, case law and Administrative Rules.

You're saying the consideration and the weight that was given the second go round is the same as it was given the first go round?

[Counsel for BLNR]: Well, it was—that could very well be because, you know, the board believes it gave appropriate weight to the evidence during the first go round. The evidence didn't change between the first decision and the second decision.

THE COURT: So this [c]ourt's decision finding otherwise, and this [c]ourt's instructions sending the matter back to the BLNR, really had no significant effect on the BLNR?

[Counsel for BLNR]: They did take a relook—they did relook at all of the evidence and, you know, to see, you know, was there something there that was not considered the first time or, you know, how could they better support their, you know, decision. How was it—would their decision be supported. And they, you know, made the amended findings and decision.

(Emphases added.)

With respect to its Amended Decision, first, the BLNR did not address the court's conclusion in its decision on the first appeal that "the current certified shoreline appears to incorrectly allow for the manipulation of the shoreline based upon artificially induced and enhanced vegetation, not in accordance with HRS § 205A–1." Although the BLNR discussed how it weighed Petitioners' evidence in its findings with respect to whether the shoreline was artificially created, it arbitrarily failed to indicate how it weighed Respondents Dobbin and Wagner's evidence.

Instead, in its Amended Decision, the BLNR simply recounted Respondents Dobbin and Wagner's evidence at findings 69 through 75. For example, on the issue of whether the sprinkler heads were aimed at the shoreline vegetation or toward the mauka portion of the property, the BLNR did not explain how it found that the Moody Affidavit, stating that "to the best of [Moody's] recollection, all the sprinkler heads on [the line closest to the shoreline] were aimed in such a fashion that the spray pattern would be parallel to or away from the shoreline[,]" was more persuasive than Petitioner Diamond's declaration or photographs. Instead, finding 72 states only that "Steve Moody, the owner of the [ ] property from 2000 to 2004, admitted to having an irrigation system [on] the property, but he testified that the system was located several feet away from the edge of the naupaka growing along the shoreline and that all of the sprinkler heads were aimed so the spray would be parallel to or away from the shoreline."

Additionally, the declarations of current and former owners provided by Dobbin and

36

Wagner do not include any testimony with respect to where they saw the highest wash of the waves on the property. Thus, the only substantial evidence of a historical nature, *see Ashford,* 50 Haw. at 315, 440 P.2d at 77, were the years of observations described in the declarations of Diamond, Blair, and Robeson, and the record fails in any way to controvert Petitioners' historical evidence.

## XV.

Based on the foregoing, the ICA's August 31, 2012 Memorandum Opinion is vacated in part, the court's March 31, 2011 decision is vacated in part, the May 21, 2010 Amended Decision of the BLNR is vacated, and the case is remanded to the court with instructions to remand the case to the BLNR for proceedings consistent with this opinion.